UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**JUDITH IMMELL,**

      **Plaintiff,**

-v-

      **Case No.: 2:12-CV-0563**
      **JUDGE SMITH**
      **Magistrate Judge Abel**

**STATE OF OHIO, CHILLICOTHE**
**CORRECTIONAL INSTITUTION,**

      **Defendant.**

## OPINION AND ORDER

Plaintiff Judith Immell brings this employment discrimination action against Defendant the State of Ohio, Chillicothe Correctional Institution, claiming that Defendant subjected her to a hostile work environment and reassigned her to a different job in retaliation for complaints of discrimination and because of (1) her gender and race in violation of Title VII, 42 U.S.C. § 2000e; (2) her age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621 *et seq*., and (3) her disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq*.  Defendant has moved for summary judgment.  (Doc. 11). Plaintiff has responded and this matter is ripe for review.  For the reasons that follow, the Court **GRANTS** Defendant's Motion for Summary Judgment.

### I. FACTS

Judith Immell is a 48 year old Caucasian female, who has been employed with the State of Ohio since August 1987.  Most recently, her position was as Mental Health Administrator 4 at the Chillicothe Correctional Institution ("CCI").  (Compl. ¶ 5).  Plaintiff was promoted to that

position sometime during 2002 or 2003.  In this position, Plaintiff supervised the entire CCI Mental Health Department including the sex offender residential treatment program.  (Immell Dep. at 11-12).  Plaintiff's educational background includes an associate's degree in human services, a bachelor's degree in psychology, and a master's degree in sociology.  (Immell Dep. at 8).

Defendant CCI is owned and operated by the Ohio Department of Rehabilitation and Corrections ("ODRC") and is located in Chillicothe, Ohio.  CCI is a Level 1 and 2 medium security facility that holds approximately 2650 offenders.  At all times relevant to this case, CCI was unique in that it housed a residential treatment unit for mentally ill inmates and it had a sex offender program where sex offenders receive different levels of intensive programming designed to prevent recidivism.  (Knab Aff. ¶ 3; Immell Dep. at 11-12).

At all times relevant to this action, Robin Knab (Caucasian female) was the Warden at CCI.  Warden Knab was responsible for the daily operation of the institution, including personnel actions.  She has been an employee with the Department of Rehabilitation and Corrections for 27 years.  Knab is also the Southwest Regional Director in the Office of Prisons where she oversees the operations of all prisons located in the southwest region of Ohio.  (Knab Aff. ¶¶ 1-2).

Norman Robinson (African-American male) was the Deputy Warden of Special Services at CCI during the relevant time period and he is now the Warden at CCI.  As Deputy Warden, Robinson supervised all of the institution's non-security related functions including the Mental Health Department.  Robinson was Plaintiff's direct supervisor.  (Immell Dep. at 13-14; Robinson Aff. ¶¶ 1-2).

### A. Plaintiff's Job Duties and Reassignment

Plaintiff, as the Mental Health Administrator 4 overseeing the mental health program, was responsible for supervising the three division supervisors and one secretary. The CCI mental health department was comprised of three divisions: the residential treatment unit, which provides residential treatment to inmates with serious mental health issues; the sex offender program, which provides differing levels of intensive programming to sex offenders; and general mental health services to inmates as needed. Each of the divisions had a supervisor, as well as a staff of psychologists and social workers. (Knab Aff. ¶¶ 3-4).

Sometime in late 2010, Bill Steinhoff, the Sex Offender Program Supervisor at CCI resigned and Knab and Robinson, at the direction of the ODRC, began discussing ways to fill the vacant position, including the option of restructuring the mental health department. In particular, Dr. Hammond, ODRC's Chief of Mental Health Services and Susan Hanger, ODRC's Director of Social Work, who were responsible for providing oversight to all of the prisons' mental health services statewide, discussed with Knab and Robinson the potential benefits of having a licensed mental health professional in the position of Mental Health Administrator 4, overseeing the mental health program. (Knab Aff. ¶¶ 4, 7-8). They all agreed that it would be more efficient and effective to have a licensed clinician oversee the mental health program because that individual could legally provide work direction to other licensed professionals. Without a licensed director, CCI would be required to seek an outside clinician to direct the work of the staff clinicians. (Knab Aff. ¶ 9). During this same time, Knab learned that individuals from the University of Cincinnati planned to work with CCI to develop new sex offender programming. Knab believed that Immell's educational background made her a top candidate to foster the relationship with the University. (*Id.*).

3

On January 11, 2011, Knab and Robinson met with Plaintiff and informed her of her reassignment. They told her that she was being reassigned based on their decision to hire a licensed mental health professional as the Mental Health Administrator 4. (Immell Dep. at 18-19). Plaintiff was given her new job description, which was to administer CCI's sex offender program as a Mental Health Administrator 4 with no loss in pay, seniority, or benefits. Also, Plaintiff's work hours and location did not change. Plaintiff would continue to perform administrative and supervisory functions over the employees assigned to the sex offender program, including one supervisor, but she was no longer responsible for overseeing the entire mental health program. (Knab Aff. ¶ 10; Immell Dep. at 18-20).

Plaintiff described that she was in "total shock. There had been no prior discussion with me, no indication that I was doing a poor job." (Immell Depo. at 20). Plaintiff further described that this was "clearly a demotion going from supervising a department of 37 to only two people, and the person who was going to take my place would become my supervisor." (Immell Dep. at 23).

Following the meeting with Plaintiff, Robinson issued a memorandum to the mental health staff stating that "MHA Judy Immell will be undertaking the Sex Offender Program at CCI. Judy's scholastic experience and guidance will propel the program to new heights." (Immell Dep. at 26, Ex. D). Immell was succeeded by Rebecca Casto, a Caucasian female aged 41, who holds a professional mental health license as a licensed independent social worker. (Knab Aff. ¶ 11).

Plaintiff never returned to work at CCI after her reassignment on January 11, 2011. She claims that Knab and Robinson specifically designed her reassignment to embarrass her and to

4

make others believe that she was incompetent. (Immell Dep. at 14, 24-25, 30-31). During the evening of January 11th, Plaintiff claims that she began experiencing heart attack symptoms and she could not sleep or stop crying. Her husband took her to the emergency room and Plaintiff was diagnosed with Post Traumatic Stress Disorder. (Immell Dep. at 38). Plaintiff began seeing a Psychiatrist and a Psychologist in February 2011, and has been receiving psychotropic medication and therapy for PTSD and major depression since. (*Id*. at 39-40).

Plaintiff describes that her new position would require her to review files and have personal interaction with sex offenders, forcing her to re-live the sexual abuse she suffered as a child. She claims that Warden Knab was well aware of Plaintiff's childhood history of abuse. (Immell Aff. ¶¶ 22-24). She further asserts that Knab and Robinson should have been aware that Plaintiff being forced to take disability leave and retirement was an expected outcome of her change in job duties. (*Id*. at 11-12).

Shortly thereafter, Plaintiff received a disability retirement through the Ohio Public Employees Retirement System. She claims that she is not fit to return to work and does not think she will ever be able to return to work. As of the briefing on this motion, Plaintiff continues to receive disability retirement. (Immell Dep. at 40-42).

**B.**     **Plaintiff's Claims of Sexual Harassment**

In addition to the trauma Plaintiff suffered as a result of her reassignment, she also alleges that she was sexually harassed by Robinson, her direct supervisor. Plaintiff describes that Robinson sexually harassed her between five and seven times during a period of a couple of months between the fall of 2010 and January 11, 2011. (Immell Dep. at 69, 74).

The first incident occurred in the fall of 2010 when Robinson told Plaintiff to "work the way he wanted me to work, and I better be a team player, and to smile, that I was prettier when I

5

smiled." (Immell Dep. at 69). Immell describes that she was intimidated because Robinson said it loudly and forcefully. (*Id*. at 69-70). Plaintiff also describes that Robinson offered to have lunch with her and she declined his requests. She mostly ate lunch in her office and he ate in his office. (*Id*. at 74-76). Additionally, she claims Robinson told her that she "needed to start socializing with him" and she declined. She states that they never socialized together. (*Id*. at 77-78). Plaintiff describes that Robinson would "go outside of the institution and he took female employees with him." (*Id*. at 74). However, she does not know why they left together and she was never invited to leave with him. (*Id*. Dep. at 74-76).

Another incident occurred when Plaintiff was meeting with two other mental health staff members, Dr. Castle and Diana Buhring. Robinson entered the room and slammed a leather bound notebook on the table "kind of like a coach coming into the locker room." (Immell Dep. at 78-79). Plaintiff describes that she was intimidated. (*Id*. at 79). In another meeting, Plaintiff asserts that she disputed some of Robinson's directions and he responded with "if you don't like it, I'll just move your office in a mop closet." (*Id*. at 89). However, her office was never moved into a mop closet. (*Id*. at 90).

Plaintiff further describes that during meetings with other employees and alone, Robinson would generally speak to her with "disdain in his voice" and would scream at her. (Immell Dep. at 86-87, 91-92). Immell does recall specific comments, but describes that "he just didn't like the way I did my job for some reason, I suppose." (*Id*. at 91).

Another incident Plaintiff described was when she was preparing for a tour from outside dignitaries and she disagreed with Robinson's choice of tour guides. Plaintiff states that she used the word "wow" in her disagreement with Robinson and he instructed her never to use the word "wow" in the institution. (Immell Dep. at 92-93). Plaintiff also states that she was

offended because Robinson selected a male to accompany her in the tour instead of another woman.  (*Id*. at 94).

Plaintiff also asserts that she thought it was inappropriate for Robinson to hang posters of male boxers in boxing trunks in "aggressive stances" in his office.  She described that she would "feel aggression" when she walked into Robinson's office.  Further, she stated that "they wouldn't allow somebody to hang up a picture of a woman in a bathing suit." (Immell Dep. at 82-83).

Finally, on November 29, 2010, the CCI Locksmith Paul Hawk issued an email identifying employees who consistently failed to follow proper procedure in conducting "key audits."  Plaintiff was included in this email and she took offense.  She complained about Mr. Hawk, and Warden Knab made him apologize to Plaintiff.  Plaintiff believes that "anybody else" would have been "put through a fact finding and disciplinary finding." (Immell Dep. at 100-104; Ex. K).

Despite now asserting these claims and describing these incidents during the course of this litigation, Plaintiff never complained about these incidents at the time and never complained of any discrimination during her employment.  (Immell Dep. at 81, 114-115).

## II. STANDARD OF REVIEW

The standard governing summary judgment is set forth in Rule 56 of the Federal Rules of Civil Procedure, which provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate, however, if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *See Muncie Power Prods., Inc. v. United Techs. Auto., Inc.,* 328 F.3d 870, 873 (6th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986).

When reviewing a summary judgment motion, the Court must view all the facts, evidence and any inferences that may permissibly be drawn from the facts, in favor of the nonmoving party. *Matsushita*, 475 U.S. at 587. The Court will ultimately determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-53. Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. *Lashlee v. Sumner*, 570 F.2d 107, 111 (6th Cir. 1978). The Court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Liberty Lobby*, 477 U.S. at 249; *Weaver v.*

8

*Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003).

In responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting *Liberty Lobby*, 477 U.S. at 257). The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *Liberty Lobby*, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Phillip Morris Companies, Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). The Court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. *Liberty Lobby*, 477 U.S. at 251-52; *see also Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, "[t]he trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street*, 886 F.2d at 1479-80. That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001).

### III. DISCUSSION

Plaintiff alleges that Defendant the State of Ohio/CCI subjected her to a hostile work environment and reassigned her to a different job in retaliation for complaints of discrimination and because of her gender and/or race in violation of Title VII, 42 U.S.C. § 2000e, her age (47) in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*,

and her alleged disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*.  Defendant has moved for summary judgment, asserting soverign immunity as a bar to Plaintiff's ADEA and ADA claims, as well as asserting that Plaintiff has failed to set forth a *prima facie* case of discrimination and/or retaliation.  The Court will address these arguments in turn.

**A.**     **Sovereign Immunity**

Defendant asserts that pursuant to the Eleventh Amendment to the United States Constitution, states and their agencies are immune from suit in federal court under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq*.; *see also Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91 (2000); *Latham v. Office of the Attorney General*, 395 F.3d 261, 270 (6th Cir. 2005).  Under the Eleventh Amendment, a State may not be sued in federal court unless it has consented to such a suit or its immunity has been properly abrogated by Congress.  Here, there has been no consent by the state, and the Supreme Court in *Kimel* expressly held that Congress, when enacting the ADEA, did not abrogate States' sovereign immunity.

Plaintiff argues that she has a claim for injunctive relief which is not barred by the Eleventh Amendment under *Ex Parte Young*.  Under the *Ex Parte Young* doctrine, the Eleventh Amendment bars federal jurisdiction over lawsuits against state officials when the relief sought is retrospective or compensatory in nature.  However, Plaintiff has only brought suit against the state, not state officials.  Accordingly, Plaintiff's ADEA claim is barred by sovereign immunity. Defendant argues, and the Court agrees that even if this reasoning applied, Plaintiff is not seeking reinstatement because she cannot return to work.

The same principles also apply to Plaintiff's ADA claims.  *See Board of Trustees of the University of Alabama v. Garrett*, 531 U.S. 356, 374 (2001); *Robinson v. University of Akron*

*School of Law*, 307 F.3d 409, 411 (6th Cir. 2002).  Plaintiff has only sued the State of Ohio, therefore, her ADA claims are barred as well.[1]

**B.      Plaintiff's Discrimination and Retaliation Claims**

Plaintiff alleges that she was subjected to discrimination based upon her race and sex. She asserts that she has sufficiently set forth a *prima facie* case of discrimination.  Because Plaintiff does not allege any direct evidence of discrimination, her claims must be evaluated under the three-part *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 803 (1973); *see also*, *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 n.1 (6th Cir. 2010) (holding that age discrimination claims based on circumstantial evidence are analyzed under *McDonnell Douglas*); *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (applying the *McDonnell Douglas* burden-shifting framework to disability discrimination claim).

Under the *McDonnell Douglas* test, if the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse action against the plaintiff.  *See id.*; *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981).  If the defendant comes forward with a legitimate, non-discriminatory reason for its actions, then the burden returns to the plaintiff to prove that the defendant's proffered reason is a mere pretext for discrimination.  *See id.*; *Burdine*, 450 U.S. at 253.  To show pretext, a plaintiff must show that the employer's proffered reasons:  (1) lack a basis in fact; (2) did not actually motivate the employer's adverse action; or (3) are insufficient to

---

[1] The Court notes that Plaintiff's alleged disability did not develop until after her reassignment, therefore, she could not establish that Defendant took the alleged adverse action because of her disability.

motivate the employer's adverse action.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994).

"The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens.  The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253.  This burden-shifting framework is intended to be flexible in differing factual circumstances.  *See, e.g.*, *Christian v. Wal–Mart Stores, Inc.*, 252 F.3d 862, 869–70 (6th Cir. 2001) (citing *Burdine*, 450 U.S. at 254 n.6).

To establish a *prima facie* case of gender and race discrimination, Plaintiff must show that: 1) she is a member of a protected class; 2) she suffered an adverse employment action; 3) she was qualified for the position; and 4) she was replaced by a person outside the protected class.  *McDonnell Douglas*, 411 U.S. at 802; *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570 (6th Cir. 2004).

Additionally, in cases of "reverse discrimination" where, as here, the plaintiff is not a member of a protected racial class, the Sixth Circuit has modified the first and fourth prongs of the traditional *prima facie* case.  *See Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004).  With respect to the first prong, a plaintiff must demonstrate "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Leadbetter*, 385 F.3d at 690, citing *Sutherland v. Michigan Dep't of the Treasury*, 344 F.3d 603, 614-15 (6th Cir. 2003).  A plaintiff establishes "such background circumstances by presenting evidence of [defendant's] unlawful consideration of race as a factor in hiring in the past justifies a suspicion that incidents of capricious discrimination against whites because of their race may be likely." *Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 256 (6th Cir.

2002). With respect to the fourth prong, "plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.* at 255.

The parties do not dispute that Plaintiff is a female and therefore a member of a protected class. Nor is there any dispute that she was qualified for her position. However, the parties dispute whether Plaintiff was subjected to an adverse employment action and whether she was replaced by a person outside the protected class.

    **1.    Adverse Employment Action**

Defendant argues that Plaintiff's reassignment, with no loss in pay or benefits and no change in working hours or job location, was not a materially adverse employment action. Plaintiff asserts that "the fact that Ms. Immell's depression resurfaced and she was diagnosed with post traumatic stress syndrome and was forced to take disability retirement are clearly adverse employment actions suffered at the hands of the defendant." (Plaintiff's Response at 13). She cites primarily the effects of her reassignment and not the reassignment itself as being the adverse employment action.

    The United States Court of Appeals for the Sixth Circuit has held:

> An adverse employment action has been defined as 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.' *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc) (citation omitted). A 'bruised ego' or a 'mere inconvenience or an alteration of job responsibilities' is not sufficient to constitute an adverse employment action. *Id.* at 797. Adverse employment actions are typically marked by a 'significant change in employment status,' including 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.' *Id.* at 798 (quoting *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

*Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). Moreover, "[t]he Sixth Circuit

has consistently held that de minimus employment actions are not materially adverse and, thus, not actionable." *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 462 (6th Cir. 2000). Thus, reassignment or lateral transfers without accompanying changes in salary, benefits, title, work hours or material responsibilities usually do not constitute adverse employment actions. *Kocsis v. Multi-Care Mgmt., Inc.,* 97 F.3d 876, 885 (6th Cir. 1996); *Momah v. Dominguez*, 239 F. App'x 114, 123 (6th Cir. 2007); *see also Arnold v. City of Columbus*, 2011 U.S. Dist. LEXIS 35807 (S.D. Ohio 2011) (Watson, J.) (finding that plaintiff's transfer was not an adverse action when no evidence was shown that the position was less prestigious, involved diminished responsibilities, or reduced pay or benefits).

Plaintiff has failed to offer any evidence that her new position with the same title, pay and benefits is in any way less desirable than her former position. Many of Plaintiff's arguments are somewhat difficult to interpret, but her primary argument is that because she suffered post traumatic stress as a result of the reassignment, it must be an adverse employment action. She also fails to understand the burden in responding to Defendant's motion for summary judgment, arguing that Defendant has failed to meet its burden. Plaintiff states that "defendant produced no documentation whatsoever to support the alleged need to restructure the Mental Health Department or change plaintiff's job duties." (Pl.'s Memo. in Opp. at 14). It is Plaintiff, however, who fails to site to any relevant evidence other than one citation to her deposition. She relies primarily on her thirteen page affidavit which is self-serving and contains many inadmissible conclusory allegations. The Court is not obligated "to comb the record to find evidence or testimony establishing a party's case." *Nersick v. CSX Transp., Inc.*, 692 F. Supp. 2d 866, 882 (S.D. Ohio 2010) (Weber, J.). Rather, Plaintiff, as the non-moving party, has an affirmative duty to direct the Court's attention to those specific portions of the record upon

14

which she seeks to rely to create a genuine issue of material fact. *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Thus, Plaintiff has failed to establish that her reassignment was an adverse employment action.

Additionally, although Plaintiff does not specifically argue this, it could be inferred that she is asserting a constructive discharge as an adverse employment action. The Sixth Circuit has held "when a transfer would have been objectively intolerable to a reasonable person, thereby amounting to a constructive discharge" and employee's rejection of the lateral transfer is an adverse employment action. *Strouss v. Mich. Dep't of Corr.*, 250 F.3d 336, 342 (6th Cir. 2001). Plaintiff suggests that Warden Knab knew that she was a victim of sexual abuse as a child and this new position would cause her to suffer from post-traumatic stress disorder. However, Plaintiff fails to adequately explain how the reassignment would be any different than her previous role which also dealt with the sex offender treatment program. Plaintiff has failed to produce any evidence that her reassignment involve the type of reduced responsibilities or menial or degrading work such that it amounted to a constructive discharge. *See Joiner v. Ohio Dep't of Trasp.*, 949 F.Supp. 562, 569 (S.D. Ohio 1996). Accordingly, Plaintiff has failed to establish that she has suffered any adverse employment action.

    **2.**    **Replaced by a person outside the protected class**

Even if Plaintiff was able to demonstrate that she suffered an adverse employment action, she has failed to establish that she was replaced by an individual outside the protected class, a male or an African American. In fact, Plaintiff was replaced by Rebecca Casto, a 41 year old Caucasian female who holds a professional mental health license as a licensed independent

15

social worker. (Knab Aff. ¶ 11). Again, it is Plaintiff's burden to produce evidence to establish that she was treated differently than a similarly-situated person outside her protected class. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). To be deemed similarly situated, the comparable employee "must have dealt with the same supervisor, have been subjected to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* Plaintiff's only argument in support of this claim is provided in her interrogatory answer: "James Lapointe, Mary Migra, Amy Noll, Nancy Frye-Jones, Jeffrey McDonald, Dirk Prise, Christopher Nicastro, Lanny Sacco and Charlotte Jenkins. These were Mental Health Administrators at other ODRC institutions and they were not forced into another job duty description. Other information unknown at this time." (Immell Dep. Ex. J at 10). However, Defendant correctly notes that none of these individuals worked under the same supervisor, Warden Knab, nor would Knab be responsible for overseeing them. Further, for purposes of reverse discrimination, Plaintiff has failed to establish that Warden Knab or ODRC ever used race as a factor in hiring, firing, or in any policy decision. Accordingly, Plaintiff has failed to offer sufficient evidence to establish a *prima facie* case of race and sex discrimination.

Finally, even if Plaintiff were able to establish a *prima facie* case of race and sex discrimination, Defendant has set forth a "legitimate, nondiscriminatory reason" for Plaintiff's reassignment. *Burdine*, 450 U.S. at 254-56. And Plaintiff cannot prove that Defendant's articulated reason was pretext, nor that the real reason for her reassignment was discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993).

Defendant claims that the reason for Plaintiff's reassignment was to place a licensed clinician in Plaintiff's position and that Plaintiff's educational background fit with the new direction of the sex offender program. And, Plaintiff has failed to set forth sufficient evidence that this reason is pretextual. Accordingly, Plaintiff's claims of race and sex discrimination fail and Defendant is entitled to summary judgment on these claims.

C.     **Plaintiff's Retaliation Claim**

Retaliation claims based on circumstantial evidence are evaluated under a variant of the *McDonnell Douglas-Burdine* burden-shifting test. *Hamilton v. GE*, 556 F.3d 428, 435 (6th Cir. 2009). To establish a *prima facie* case of retaliation, a plaintiff must show that "(1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant subjected plaintiff to a materially adverse employment action; and (4) a causal connection exists between the protected activity and the materially adverse employment action." *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 792 (6th Cir. 2000).

Plaintiff's retaliation claim fails for same reasons as set forth above. She cannot establish that she was subjected to a materially adverse employment action. Further, she has failed to provide sufficient evidence that she engaged in any protected activity or that the exercise of her protected rights was known to Defendant. Plaintiff merely alleged that she was "obviously retaliated against for her refusal to accept the sexual advances and demands by Mr. Robinson." (Pl.'s Memo. in Opp. at 9). Plaintiff admits that she did not file any formal complaints of discrimination. She does claim that "she complained to defendant of the discriminatory and/or retaliatory acts and conduct to which she was subjected on numerous occasions but no action was taken to correct same." (*Id.* at 10). However, this is not sufficient to establish a *prima facie* case of retaliation. Accordingly, Defendant is entitled to summary judgment on Plaintiff's

retaliation claim.

### D.     Plaintiff's Hostile Work Environment Claim

In addition to general claims of race and sex discrimination and harassment, Plaintiff also alleges that she was subjected to a hostile work environment. To establish a claim for discrimination by being subjected to a hostile work environment, Plaintiff must show:

> (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventive actions. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560-61 (6th Cir. 1999) (discussing the requirements for proving a hostile work environment claim based upon gender); *Moore v. KUKA Welding Sys. & Robot. Corp.*, 171 F.3d 1073, 1078-79 (6th Cir. 1999) (setting forth the elements of a prima facie case for a claim of a hostile work environment based upon race).

*Howard v. Bd. of Educ.*, 70 F. App'x 272, 281 (6th Cir. 2003) (citing *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 604-05 (6th Cir. 2002)). The Sixth Circuit has further explained that a Title VII plaintiff must show that

> the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment . . . . Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Virgilio v. Potter*, 59 F. App'x 678, 681 (6th Cir. 2003) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)) (internal quotes and citations omitted); *see also Howard*, 70 F. App'x at 282. Thus, there is both a subjective and an objective prong to this standard. In other words, "the conduct must be severe or pervasive enough to create an

environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive." *Black v. Zaring Homes*, 104 F.3d 822, 826 (6th Cir. 1997) (citing *Harris*, 510 U.S. at 21-22). The question before the Court is whether a reasonable person would have found Plaintiff's work environment to be hostile or abusive. In making this determination, there are several factors the Court must consider, including "[t]he frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Defendant argues that Plaintiff's allegations of the alleged discriminatory conduct are not objectively severe or pervasive to establish a hostile work environment claim. The alleged conduct was very sporadic, occurring between five and seven times over a 4 to 5 month period. Plaintiff claims her supervisor told her she was prettier when she smiled, invited her to lunch, and made vague references to socializing outside of the institution. Additionally, Plaintiff describes that Robinson "screamed" and had "disdain" in his voice, that he had boxing posters in his office, instructed her not to use the word "wow" and assigned a male instead of a female to work with her in conducting a tour of the institution. Finally, Robinson threatened to move Plaintiff's office to a mop closet.

The aforementioned incidents are not severe or pervasive enough to create a hostile work environment. The acts are irregular and sporadic, rather than continuous and frequent, therefore making it difficult to establish a hostile work environment claim. "Simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1988). Further, Plaintiff has failed to establish that the allegations are linked to her

19

race or gender.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Doc. 11).  Final judgment shall be entered in favor of Defendant.

The Clerk shall remove Document 11 from the Court's pending motions list.

The Clerk shall remove this case from the Court's pending cases list.

**IT IS SO ORDERED.**

 *s/ George C. Smith*
**GEORGE C. SMITH, JUDGE
UNITED STATES DISTRICT COURT**